IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| ADRIAN MCLEOD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 1:19-CV-191-KFP |
| | ) | |
| ANDREW SAUL,[1] | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

## I.    INTRODUCTION

On April 23, 2015, Plaintiff protectively filed a Title II application for a period of

disability and disability insurance alleging disability beginning February 23, 2015. Doc. 11

at 1. The claim was denied on July 30, 2015. *Id.* After a hearing before an Administrative

Law Judge (ALJ) on December 9, 2016, and a supplemental hearing on October 6, 2017,

Plaintiff received an unfavorable decision on February 29, 2018. *Id.* He sought review of

the decision from the Appeals Council, which denied his request. R. 1. Thus, the ALJ's

decision became a final decision of the Commissioner. *See Chester v. Bowen*, 792 F.2d

129, 131 (11th Cir. 1986). The case is now before the Court for review of that decision

under 42 U.S.C. § 405(g). Pursuant to 28 U.S.C. § 636(c), both parties have consented to

the conduct of all proceedings and entry of a final judgment by the undersigned United

---

[1] Andrew Saul is now the Commissioner of Social Security and is automatically substituted as a party
pursuant to Fed. R. Civ. Proc. 25(d). *See also* § 205(g) of the Social Security, 42 U.S.C. § 405(g) (action
survives regardless of any change in the person occupying the office of Commissioner of Social Security).

States Magistrate Judge. Docs. 14 and 15. Based on a review of the record and the briefs of the parties, the Court finds that the ALJ's decision was based on substantial evidence and employed proper legal standards. Accordingly, the Commissioner's decision is AFFIRMED.

## II.    STANDARD OF REVIEW

The Court's review of the Commissioner's decision is a limited one. The Court's sole function is to determine whether the ALJ's opinion is supported by substantial evidence and whether the proper legal standards were applied. *See Jones v. Apfel,* 190 F.3d 1224, 1228 (11th Cir. 1999); *Bloodsworth v. Heckler,* 703 F.2d 1233, 1239 (11th Cir. 1983). "The Social Security Act mandates that 'findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive.'" *Foote v. Chater,* 67 F.3d 1553, 1560 (11th Cir. 1995) (quoting 42 U.S.C. §405(g)). Thus, this Court must find the Commissioner's decision conclusive if it is supported by substantial evidence. *Graham v. Apfel,* 129 F.3d 1420, 1422 (11th Cir. 1997). Substantial evidence is more than a scintilla — i.e., the evidence must do more than merely create a suspicion of the existence of a fact and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *Lewis v. Callahan,* 125 F.3d 1436, 1440 (11th Cir. 1997) (citing *Richardson v. Perales,* 402 U.S. 389 (1971)); *Foote,* 67 F.3d at 1560 (citing *Walden v. Schweiker,* 672 F.2d 835, 838 (11th Cir. 1982)).

If the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the court would have reached a contrary result as finder of fact and even if the evidence preponderates against the Commissioner's findings. *Ellison v.*

*Barnhart,* 355 F.3d 1272, 1275 (11th Cir. 2003); *Edwards v. Sullivan,* 937 F.2d 580, 584 n.3 (11th Cir. 1991) (quoting *MacGregor v. Bowen,* 786 F.2d 1050, 1053 (11th Cir. 1986)). The Court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote,* 67 F.3d at 1560 (citing *Chester v. Bowen,* 792 F.2d 129, 131 (11th Cir. 1986). The Court "may not decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the [Commissioner]," but rather it "must defer to the Commissioner's decision if it is supported by substantial evidence*." Miles v. Chater,* 84 F.3d 1397, 1400 (11th Cir. 1997) (quoting *Bloodsworth,* 703 F.2d at 1239).

The Court will also reverse a Commissioner's decision on plenary review if the decision applies incorrect law or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law. *Keeton v. Dep't of Health and Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994) (citing *Cornelius v. Sullivan,* 936 F.2d 1143, 1145 (11th Cir. 1991)). There is no presumption that the Commissioner's conclusions of law are valid. *Id.*; *Brown v. Sullivan,* 921 F.2d 1233, 1236 (11th Cir. 1991) (quoting *MacGregor,* 786 F.2d at 1053).

## III.    STATUTORY AND REGULATORY FRAMEWORK

The Social Security Act's general disability insurance benefits program (DIB) provides income to individuals who are forced into involuntary, premature retirement, provided they are both insured and disabled, regardless of indigence. *See* 42 U.S.C. § 423(a). The Social Security Act's Supplemental Security Income (SSI) is a separate and distinct program. SSI is a general public assistance measure providing an additional resource to the aged, blind, and disabled to assure that their income does not fall below the

poverty line. Eligibility for SSI is based on proof of indigence and disability. *See* 42 U.S.C. §§ 1382(a), 1382c(a)(3)(A)–(C). However, despite the fact they are separate programs, the law and regulations governing a claim for DIB and a claim for SSI are identical; therefore, claims for DIB and SSI are treated identically for the purpose of determining whether a claimant is disabled. *Patterson v. Bowen,* 799 F.2d 1455, 1456 n.1 (11th Cir. 1986).

Applicants under DIB and SSI must prove "disability" within the meaning of the Social Security Act, which defines disability in virtually identical language for both programs. *See* 42 U.S.C. §§ 423(d), 1382c(a)(3), 1382c(a)(3)(G); 20 C.F.R. §§ 404.1505(a), 416.905(a). A person is entitled to disability benefits when the person is unable to do the following:

> Engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A "physical or mental impairment" is one resulting from anatomical, physiological, or psychological abnormalities that are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The Commissioner of Social Security uses a five-step, sequential evaluation process to determine if a claimant is entitled to benefits:

(1)     Is the person currently unemployed?

(2)     Is the person's impairment(s) severe?

      (3)     Does the person's impairment(s) meet or equal one of the specific impairments set forth in Listing of Impairments in Appendix I of 20 C.F.R. Pt. 404, Subpt. P?

      (4)     Is the person unable to perform his or her former occupation?

      (5)     Is the person unable to perform any other work within the economy?

*McDaniel v. Bowen,* 800 F.2d 1026, 1030 (11th Cir. 1986); 20 C.F.R. §§ 404.1520, 416.920 (2010). An affirmative answer to any question leads either to the next question or, on Steps 3 and 5, to a finding of disability. A negative answer to any question except Step 3 leads to a determination of not disabled. *McDaniel v. Bowen,* 800 F.2d at 1030; 20 C.F.R. § 416.920(a)–(f).

     The burden of proof rests on a claimant through Step 4. *See Phillips v. Barnhart,* 357 F.3d 1232, 1237–39 (11th Cir. 2004). Claimants establish a prima facie case of qualifying for disability once they meet the burden of proof from Step 1 through Step 4. At Step 5, the burden shifts to the Commissioner, who must then show there are a significant number of jobs in the national economy the claimant can perform. *Id.*

     To perform Steps 4 and 5, the ALJ must first determine the claimant's Residual Functional Capacity (RFC). *Id.* at 1238–39. RFC is what the claimant is still able to do despite his impairments and is based on all relevant medical and other evidence. *Id.* It also can contain both exertional and non-exertional limitations. *Id.* at 1242–43. At Step 5, the ALJ considers the claimant's RFC, age, education, and work experience to determine if there are jobs available in the national economy the claimant can perform. *Id.* at 1239. To do this, the ALJ can either use the Medical Vocational Guidelines (grids) or hear testimony from a vocational expert (VE). *Id.* at 1239–40.

The grids allow the ALJ to consider factors such as age, confinement to sedentary or light work, inability to speak English, educational deficiencies, and lack of job experience. Each factor can independently limit the number of jobs realistically available to an individual. *Id.* at 1240. Combinations of these factors yield a statutorily-required finding of "disabled" or "not disabled." *Id.*

## IV.    ADMINISTRATIVE PROCEEDINGS

Following the administrative hearing and employing the five-step process, the ALJ found at Step One that Plaintiff had engaged in substantial gainful activity that may have risen to the level of substantial gainful activity after the alleged onset date in February 2015. R. 20. However, the ALJ also found there had been a continuous 12-month period during which the claimant did not engage in substantial gainful activity. *Id.* At Step Two, the ALJ found Plaintiff has the following severe impairments: pancreatitis, bilateral hip degenerative joint disease, sacroiliitis, peripheral neuropathy, and lumbar curvature with degenerative endplate changes and osteophytosis. *Id.* However, at Step 3, the ALJ concluded that Plaintiff did not have an impairment or combination of impairments that meets or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526). *Id.* at 21.

Because the ALJ found that Plaintiff's impairments did not meet any of the listings, he assessed Plaintiff's residual functional capacity, which he articulated as follows:

> [T]he claimant has the residual functional capacity to perform a restricted range of light work. . . . The claimant can lift and/or carry up to 20 pounds occasionally and 10 pounds frequently. The claimant can stand and/or walk four hours, no more than thirty minutes at a time. The claimant can sit six hours, no more than two hours at a time. The claimant can occasionally push

and/or pull with the upper extremities, bilaterally; and occasionally push and/or pull with the lower extremities, bilaterally. The claimant can occasionally balance, occasionally stoop, occasionally kneel, occasionally crouch, occasionally crawl, and occasionally climb ramps and stairs. The claimant cannot climb ladders, ropes and scaffolds. The claimant can frequently reach, bilaterally; frequently handle, bilaterally; continuously finger, bilaterally; and continuously feel, bilaterally. The claimant can tolerate occasional exposure to extreme heat; occasional exposure to extreme cold, occasional exposure to humidity, and occasional exposure to pulmonary irritants. The claimant must avoid all exposure to unprotected heights and avoid all exposure to dangerous machinery. The claimant is able to sustain attention for two-hour periods with customary breaks.

*Id.* The ALJ stated that he considered all Plaintiff's symptoms and the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 C.F.R. §§ 404.1529 and SSR 16-3p. *Id.* at 22. The ALJ also stated that he considered opinion evidence in accordance with 20 C.F.R. §§ 404.1527. *Id.*

At Step Four, the ALJ found Plaintiff unable to perform any past relevant work as actually or generally performed. *Id.* at 26. Next, based on the testimony of a vocational expert and considering the Plaintiff's age, education, work experience, and residual functional capacity, he concluded that the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy, specifically the light, unskilled jobs of router, electrical assembler, and cashier II. *Id.* at 27. Thus, the ALJ concluded that Plaintiff was not under a disability as defined by the Social Security Act from February 23, 2015, through the date of his decision. *Id.*

## V.    PLAINTIFF'S ARGUMENT

The only issue Plaintiff raises is whether the ALJ erred in assigning "no substantial weight" to the opinions of Dr. Caudill Miller and Dr. Richard Meadows, two consultative examining physicians. Doc. 11 at 4. Specifically, he argues the ALJ continued the initial hearing so Plaintiff could be examined by the additional doctors, "explicitly stat[ing] a need for further objective testing," and then "ignore[d] the very objective testing that [he] previously felt was necessary to determine the case." *Id.*

## VI.   DISCUSSION

At the initial hearing, Plaintiff testified that his daily activities include helping his mother by cooking, washing dishes, and washing his clothes. R. 54. He makes his bed, cleans his room, sits around the house, and will "cook dinner or something." *Id.* at 55. He said he does not drive because he cannot get his leg up to mash the foot pedal or brakes. *Id.* He testified that he can stand for one hour before having to sit down. *Id.* He takes pain pills, but they keep him dizzy and sleepy. *Id.* He can walk only five minutes before sitting down because he has emphysema and cannot breathe. *Id.* at 56. His family doctor in Newton told him he had emphysema a year and a half earlier. *Id.* He testified that he has sharp pain in his feet, which stay numb all the time, and pain shoots up his legs into his knees. *Id.* at 57. Plaintiff said his doctor could not figure out the pain in his feet but told him if he had insurance he could go to a "hospital or something like that," instead of a family health clinic. *Id.* He said he cannot sit for long periods of time because he must keep moving to prevent the pain. *Id.* at 58. He will stand for a few minutes and then walk to help with the pain. *Id*. He lies down five or six times a day, and, if he gets up, he will walk and

then sit down. *Id.* at 59. He will get something to eat, walk outside, stretch for a few minutes, sit down, and then lie down again. *Id.*

After the testimony regarding pain in his feet, the ALJ stated: "Well, I think what we're going to have to do is before we get into our vocational expert testimony is see if we can nail down some objective . . . evidence related to these complaints. We've already got a PFT in the record, but I'd like to get some . . . lumbar X-rays and a nerve conduction study . . . of the lower extremities. Because right now, we don't have a peripheral neuropathy diagnosis, which is the most likely ideology for the foot complaints. So, I'm going to send your client out for two consultative evaluations if the Agency will bear it, an orthopedic and neurological, and then reconvene." *Id*. at 61. The ALJ suspected peripheral neuropathy was the cause of Plaintiff's foot pain, but there was no objective medical evidence in the record. Plaintiff was referred to Dr. Caudill Miller, a neurologist, and to Dr. Richard Meadows, an orthopedist.

### A.     Dr. Miller's Opinion

When Plaintiff saw Dr. Miller, he reported having back pain radiating down into his legs with some numbness and tingling in his legs and feet. *Id.* at 417. Dr. Miller performed a nerve conduction velocity test (NCV) and an electromyography (EMG). *Id.* The EMG results were normal, and the NCV results were partially normal but showed some evidence of prolonged terminal latency, slow motor nerve conduction velocities, slow sensory nerve conduction velocities, and an absent H-reflex bilaterally. *Id.* According to Dr. Miller, these results indicated diffuse sensorimotor peripheral neuropathy in his right and left lower extremities but no radiculopathy. *Id*.

Dr. Miller also examined the Plaintiff and found that he was in no distress, had normal cardiological findings, and was neurologically intact. *Id.* at 430–31. He had full motor strength in all areas. *Id.* at 431. Although he had decreased sensory sensation in a stocking distribution, his gait was normal, and he had a negative straight leg raise test, negative Patrick sign bilaterally, negative Babinski test bilaterally, and lumbar spine flexion of 80 degrees. *Id.* at 430–31.

Dr. Miller completed a medical source statement with limitations, among others, of sitting for eight hours, only one hour at a time; standing and walking for one hour, only thirty and fifteen minutes at a time, respectively; lifting and carrying up to ten pounds only occasionally; using hands for reaching overhead and other directions, handling, fingering, feeling, pushing, and pulling only occasionally; never climbing ramps and stairs or being exposed to extreme heat or cold; and working in a quiet (library) setting. *Id.* at 420–24. He also found that Plaintiff was capable of shopping, traveling, walking a block on rough or uneven surfaces, using public transportation, climbing steps at a reasonable pace, preparing simple meal, caring for personal hygiene, and sorting, handling, and using paper and files. *Id.* at 425.

The ALJ determined that Dr. Miller's restrictions were not consistent with his examination findings, "especially those involving the upper extremities," and assigned it "no substantial weight." Plaintiff argues this was error because Dr. Miller's testing, which indicates "diffuse sensorimotor peripheral neuropathy in the right and lower extremities," is the best objective medical evidence of record and that no other medical evidence contradicts it. Doc. 11 at 7–8.

As a one-time examining physician, the opinion of Dr. Miller is not entitled to substantial weight. *Arnold v. Soc. Sec. Admin., Comm'r*, 724 F. App'x 772, 779 (11th Cir. 2018) (citing *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1160 (11th Cir. 2004) (determining that a one-time examiner's opinion was not entitled to great weight); *McSwain v. Bowen*, 814 F.2d 617, 619 (11th Cir. 1987) (finding that an ALJ need not defer to the opinion of a physician who conducted a single examination because that physician is not a treating physician)). Additionally, an ALJ may reject any medical opinion if the evidence supports a contrary finding. *Id.* (citing *Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1985)).

In this case, the ALJ's decision to assign no substantial weight to Dr. Miller's opinion is supported by substantial evidence. First, while it is true that no medical evidence contradicts Dr. Miller's objective testing and diagnosis of peripheral neuropathy, it is not the impairment, but the functional limitations affecting the ability to work, that render someone disabled. *Moore v. Barnhart*, 405 F.3d 1208, 1213 n.6 (11th Cir. 2005) ("To a large extent, Moore questions the ALJ's RFC determination based solely on the fact that she *has* varus leg instability and shoulder separation. However, the mere existence of these impairments does not reveal the extent to which they limit her ability to work or undermine the ALJ's determination in that regard. *See McCruter v. Bowen,* 791 F.2d 1544, 1547 (11th Cir. 1986) ("'severity' of a medically ascertained disability must be measured in terms of its effect upon ability to work")). To be entitled to disability benefits, Plaintiff must be unable "to engage in any substantial gainful activity." 42 U.S.C. § 423(d)(1)(A).

Second, regarding Plaintiff's upper extremities, there is nothing in Dr. Miller's findings or the record to explain his hand limitations on Plaintiff's reaching, handling, fingering, or feeling. Plaintiff made no complaints about his upper extremities, Dr. Miller performed no testing on Plaintiff's upper extremities, and he made no assessments or diagnoses with respect to Plaintiff's upper extremities. The same is true with the limitation of working in a quiet, library setting. Dr. Miller did not explain any of these restrictions, and there is no evidence of functional limitations in Plaintiff's hands, arms, or hearing ability over the course of his treatment. This total lack of evidence of any problems with Plaintiff's upper extremities or hearing supports the decision to assign no substantial weight to Dr. Miller's opinion. *See Abbington v. Berryhill*, No. 1:17-CV-552-N, 2019 WL 938884, at *9 (S.D. Ala. Feb. 26, 2019) ("As for Dr. Harris's manipulative limitations opinion, the ALJ expressly noted that Dr. Harris's report indicated that, while she 'did not lace and unlace well,' Abbington had 'full range of motion of the elbows, wrists, and all finger joints[, her] grip and pinch strength was 3/5[, and s]he was able to open and close doors, button and unbutton, and pick up small objects.' . . . This is substantial evidence supporting the ALJ's decision to only give 'some' weight to Dr. Harris's opinion regarding manipulative limitations.")

With respect to the lower extremity restrictions, even though the test results indicated peripheral neuropathy affecting Plaintiff's feet, Dr. Miller stated his disability "[m]ay be more pulmonary and cardiac." R. 433. Because Dr. Miller did not review Plaintiff's previous medical records, the only basis for this conclusion is Plaintiff's own

reporting of symptoms and medical history.[2] Dr. Miller's conclusion discounts Plaintiff's peripheral neuropathy as a disabling impairment and fails to support Dr. Miller's limitations on the amount of time Plaintiff can sit, stand, and walk, which are also contradicted by Dr. Miller's own opinion that Plaintiff is capable of shopping, traveling, walking a block on rough or uneven surfaces, using public transportation, and climbing steps at a reasonable pace.[3] These inconsistencies support the ALJ's decision to assign no substantial weight to the Dr. Miller's opinion.

The Court also finds that the ALJ clearly articulated the reasons for the assigned weight to Dr. Miller's opinion and that substantial evidence supports that explanation. Before concluding that the opinion was not supported by Dr. Miller's examination or the objective evidence of record, the ALJ noted that Plaintiff's EMG test was normal for all muscles in the upper and lower extremities with no evidence of radiculopathy. R. 23. The ALJ also noted that, while Plaintiff had decreased sensation in the stocking distribution, Dr. Miller found he was in no obvious distress, he had normal cardiovascular findings and was neurologically intact, his motor strength in the upper and lower extremities was normal, his gait was normal, and he had a negative seated straight leg test, a negative

_____

[2] Dr. Miller noted that Plaintiff "has alot of medical problems." R. 433. Plaintiff reported to Dr. Miller that he has back pain, hypertension, congestive heart failure, emphysema, asthma, osteoarthritis, and low back pain. *Id.* at 427–28. The Court notes that Plaintiff's cardiac testing has shown normal findings. *Id.* at 260–61, 278–82, 302–05. A chest x-ray in January of 2014 revealed findings of "probable COPD," but a pulmonary function test in June 2015 was normal for his age. *Id.* at 307–11, 350. As for osteoarthritis, x-rays of Plaintiff's hips taken by Dr. Meadows revealed only "very subtle osteophyte formation/osteoarthritis." *Id.* at 446–47.

[3] Additionally, Dr. Miller's restriction that Plaintiff can never climb ramps or stairs is inconsistent with his opinion that Plaintiff can climb steps at a reasonable pace, and his restriction of standing only thirty minutes at one time is contradicted by Plaintiff's own testimony at the first hearing: "I can stand probably an hour, and then I have to sit down. . . ." R. 55.

Patrick sign bilaterally, a negative Babinski test bilaterally, and lumbar spine flexion of 80 degrees. *Id.* at 24.

Plaintiff relies on a case that is distinguishable from the instant case to support his argument that the ALJ erred in assigning no substantial weight to Dr. Miller's opinion. In *King v. Barnhart*, 320 F. Supp. 2d 1227, 1232 (N.D. Ala. 2004), the consultative examining doctor's findings suggested possible diagnoses of depressive disorder, psychotic disorder, anxiety disorder, schizophrenic disorder, and schizotypal personality disorder. *Id.* at 1230. He said the plaintiff had elements of posttraumatic stress, that she needed treatment, and that panic attacks kept her from leaving home. *Id.* at 1231. He diagnosed her with moderate posttraumatic stress disorder with panic attacks and moderate to severe adjustment disorder with depressed mood. *Id.* He said her distress was "rather extreme" and that her psychological difficulties were a "moderately severe impairment." *Id.* He completed a medical source statement and assessed the plaintiff as "marked" or "extreme" in twelve out of eighteen areas. *Id.* The ALJ gave little weight to this opinion because the restrictions were not supported by medical evidence or the claimant's alleged symptoms and because the doctor was not a treating physician. *Id.* at 1232, n.14. The district court found the ALJ had erred in ignoring the fact that the doctor was a specialist and ignoring the doctor's testing, which was not contradicted by other evidence. *Id.* at 1233.

Here, while there is no evidence in the record contradicting the *diagnosis* of peripheral neuropathy, there is evidence contradicting Dr. Miller's *functional limitations*, including the normal EMG, normal cardiac testing, normal pulmonary function test, Dr. Miller's own examination findings, his opinion that Plaintiff's disability may be more

cardiac and pulmonary, and the findings of Dr. Meadows discussed below. Moreover, the ALJ's functional limitations are identical to Dr. Miller's restrictions on lifting and carrying up to twenty pounds; pushing and pulling with hands; using feet for operating of foot controls; balancing, stooping, kneeling, crouching, and crawling; climbing ladders and scaffolds; being exposed to humidity, wetness, dust, odors and pulmonary irritants; and exposure to unprotected heights or moving machinery. For activities where the ALJ's functional limitations are not identical, they generally align with Dr. Meadows' restrictions.[4] As for the limitations on sitting, standing, and walking, the ALJ did not ignore the objective testing performed by Dr. Miller. He recognized that Plaintiff's peripheral neuropathy is a severe impairment, and he accommodated this impairment with the limitations of sitting only two hours at a time six hours a day, standing only thirty minutes at a time four hours a day, and walking only thirty minutes at a time four hours a day.[5] Although Plaintiff does not point to a particular functional limitation of Dr. Miller's that should have been adopted by the ALJ, the law is well-settled that an RFC "need not be identical to a medical source statement from a physician, only supported by substantial evidence. Indeed, a requirement that an ALJ's RFC finding must be based on a physician's medical source statement would confer upon the physician the authority to determine the RFC, which would abdicate the Commissioner's statutory responsibility to determine

---

[4] As explained below, many of Dr. Meadows' functional limitations are less restrictive than Dr. Miller's.
[5] The ALJ's limitations on how long the Plaintiff can sit, stand, or walk at one time are more restrictive than those in Dr. Meadows' opinion, which Plaintiff also argues was due substantial weight. Dr. Meadows opined that Plaintiff could sit for three hours at a time (as opposed to two) and stand and walk for one hour at a time (as opposed to thirty minutes).

whether an individual is disabled." *Driggers v. Astrue*, No. 1:12-CV-00272-LSC, 2012 WL 4478963, at *4 (N.D. Ala. Sept. 20, 2012) (citations omitted). Accordingly, the ALJ did not err in assigning "no substantial weight" to Dr. Miller's opinion.

### B.    Dr. Meadows' Opinion

When Plaintiff saw Dr. Meadows, he found that Plaintiff's back was tender to palpitation in the lumbar-sacral spine. R. 436. The seated straight leg raise was negative to 90 degrees with some pain with range of motion in the back and hip, and he toe-walked and heel-walked poorly. *Id*. However, he had full range of motion in his spine, hips, knees, ankles, shoulders, elbows, forearms, and wrists (but pain with the full range of motion in his hips and knees). *Id.* at 438–39. He had full grip strength in his arms, good opposition and oppositional strength in his legs, normal ankle strength, no effusion, no edema, and normal strength, tone, and reflexes. *Id*. at 436. He could fully squat and rise without difficulty, the Romberg test was negative, and the Tinels test caused pain in the wrist but no paresthesia. *Id.* Lumbar spine x-rays reflected subtle dextro-convex curvature; no anteriolisthesis, retrolisthesis, or fractures; and minimal multilevel degenerative end plate change characterized by subtle marginal osteophyte formation most pronounced along the superior end plate of L4. *Id*. at 446. Hip x-rays showed no appreciable osseous abnormality of the bony pelvis, no acute osseous abnormality, and very subtle osteophyte formation/osteoarthritis along the superior lateral aspect of the acetabulum. *Id*. at 447.

Dr. Meadows completed a medical source statement with the following functional limitations, among others: lifting and carrying up to 50 pounds occasionally; sitting for six hours, three hours at a time; standing for two hours, one hour at a time; walking for two

hours, one hour at a time; climbing ladders or scaffolds occasionally, frequent exposure to extreme heat and cold; frequent exposure to humidity and wetness, dust, odor, and pulmonary irritants, occasional exposure to unprotected heights or moving mechanical parts; and the ability to work in a very loud (jackhammer) setting. Additionally, like Dr. Miller, Dr. Meadows opined that Plaintiff could shop, travel, walk a block on rough or uneven surfaces, use public transportation, and climb steps at a reasonable pace.

The ALJ determined that Dr. Meadows' opinion was inconsistent with the medical evidence of record reflecting Plaintiff's history of minimal, conservative treatment with generally mild objective findings and normal examinations, and he assigned it "no substantial weight." Plaintiff argues this determination was "clearly errant when one considers the outcome of the two consultative examinations that the ALJ felt necessary to properly consider the case." Again, however, as with Dr. Miller, Dr. Meadows' opinion as a one-time examining physician is not entitled substantial weight, and an ALJ may reject it if the evidence supports a contrary finding.

The Court finds that the ALJ's decision to assign no substantial weight to Dr. Meadows is supported by substantial evidence. With regard to the outcomes of the two consultative examinations, they include a nerve conduction study indicating peripheral neuropathy and x-rays reflecting only "minimal" and "subtle" findings. Further, although Dr. Meadows found Plaintiff's back was tender to palpitation, he had some pain with the seated straight leg raise test and full range of motion in his hips and knees, and he toe-walked and heel-walked poorly, all other findings were normal, including full range of motion in all areas tested, full upper and lower body strength, the ability to squat without

difficulty, and normal tone and reflexes. Therefore, the Court is not persuaded that the outcome of the two consultative examinations demonstrates that the ALJ's determination was "clearly errant."

Additionally, the ALJ clearly articulated why he assigned no substantial weight to Dr. Meadows' opinion, and substantial evidence supports that explanation. The ALJ stated that the opinion was not consistent with Plaintiff's minimal, conservative treatment history and generally mild objective findings and normal examinations. R. 25. In his decision, the ALJ detailed the examination findings of Dr. Miller and Dr. Meadows described above. *Id*. at 24. He also noted that Plaintiff has been generally treated with anti-inflammatories for his alleged pain, not requiring injections, emergency treatment, or hospitalization. *Id*. at 25. He listed Plaintiff's daily living activities of performing household chores, preparing simple meals, and shopping in stores. *Id.* He also described Plaintiff's previous medical treatment in detail. This included a cyst in January 2015 that resolved by May 2015; a pulmonary function test that was normal for his age; normal cardiac test results; and a hip x-ray in December 2016 that revealed moderate degenerative joint disease but with pain that was somewhat relieved by Ibuprofen, a normal gait, and normal movement, tone, and strength in all extremities. *Id.* at 22–23, R. 376–77, 386. All of these findings constitute substantial evidence supporting the ALJ's decision not to assign substantial weight to Dr. Meadows' opinion.

Plaintiff cites *Henry v. Comm'r of Soc. Sec.*, 802 F.3d 1264 (11th Cir. 2015) for the proposition that discounting Dr. Meadows' opinion due to a history of mild, conservative

treatment was error. In *Henry*, however, the ALJ relied on a lack of treatment without developing the record and or considering the claimant's inability to pay for the treatment:

> The ALJ discredited Dr. Barber's opinion as inconsistent with Henry's "limited and conservative treatment," specifically citing Henry's failure to seek hospitalization, narcotics, or steroidal injections. Despite Henry's statement that he is unable to pay for continued medical treatment, including chiropractic care, the ALJ neither developed the record nor addressed Henry's financial ability to pursue a more rigorous course of treatment. As such, the ALJ failed to consider any good cause explanations for failure to seek medical treatment and dispel any inconsistencies with Dr. Barber's assessment.

*Id.* at 1268. *Henry* is distinguishable because the ALJ in this case did not base his decision on a lack of treatment. He continued the first hearing to obtain additional medical evidence, and his conclusions were based on that evidence combined with Plaintiff's previous medical history for the relevant period. A history of minimal, conservative treatment with mild and normal findings is not the same as a lack of treatment because the claimant could not afford it.[6]

Again, Plaintiff does not point to specific limitations by either doctor that should have been adopted by the ALJ, but, as stated above, an RFC need not be identical to a medical source statement. The ALJ did not incorporate all of Dr. Meadows' functional limitations, but he incorporated most of them. Dr. Meadows' functional limitations are

---

[6] Plaintiff has not argued that he needed additional treatment that he could not afford. He did testify that he lacked the money to get a particular medicine, but in the next sentence he stated, "And I got new medicine they'll put me on today. I got two bottles of that." R. 58. He testified that he took medicine to the point of staying dizzy all the time. Therefore, it does not appear that Plaintiff had problems paying for his medication. Plaintiff also testified that his doctor could not figure out the pain in his feet but told him he could go to a "hospital or something like that" if he had insurance. *Id.* at 57. However, this was remedied by referring Plaintiff to Dr. Miller for the NCV and EMG.

identical to the ALJ's limitations in many areas, and his limitations on how long Plaintiff can sit, stand, and walk at one time are *less restrictive* than the ALJ's.[7] In fact, the ALJ's functional limitations for most activities either match or fall between those of Dr. Miller and Dr. Meadows. The only exception is the length of time Plaintiff can stand or walk in total during an eight-hour day. The ALJ determined Plaintiff could do both for four out of eight hours, while Dr. Miller said he could do both for one hour and Dr. Meadows said he could do both for two hours. However, the ALJ was not required to pick and choose the most restrictive limitation from each doctor. Because the ALJ assigned no substantial weight to each opinion, the RFC could not be expected to mirror their opinions.[8] *Abbington*, 2019 WL 938884 at *9; *see also Beegle v. Soc. Sec. Admin., Com'r*, 482 F. App'x 483, 486 (11th Cir. 2012) (per curiam) (unpublished) ("A claimant's residual functional capacity is a matter reserved for the ALJ's determination, and while a physician's opinion on the matter will be considered, it is not dispositive.").

## VII.   CONCLUSION

Accordingly, the decision of the Commissioner is AFFIRMED. A separate judgment will issue.

---

[7] Plaintiff describes the peripheral neuropathy diagnosis as "neither 'generally mild' nor 'normal.'" Doc. 11 at 9. However, Dr. Meadows was fully aware of this diagnosis when he completed the medical source statement indicating the Plaintiff can sit, stand, and walk at one time for longer periods than the ALJ determined. R. 435.

[8] Although Plaintiff argues that the ALJ erred in assigning no substantial weight to both opinions, due to the differences in the limitations assigned by each doctor, any RFC based on these two opinions would necessarily deviate from one medical opinion or the other.

DONE this 29th day of March, 2021.


/s/ Kelly Fitzgerald Pate
KELLY FITZGERALD PATE
UNITED STATES MAGISTRATE JUDGE